UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALMA GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 4477 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DRAW ENTERPRISES III, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Alma Garcia sued her former employer, Draw Enterprises III, LLC, alleging that she was

denied overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et*

*seq*., the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq*., and the Illinois Wage

Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*., and that she was fired in

violation of the FLSA and IWPCA due to her complaints about the denial of overtime pay. Doc.

1. Trial has been set for April 29, 2019. Doc. 53. Draw moves for summary judgment. Doc.

40. The motion is denied.

**Background**

The following facts are set forth as favorably to Garcia, the non-movant, as the record

and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosp. Corp.*, 892 F.3d 887, 893

(7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does

not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

Some preliminary observations before getting to the facts. First, to the extent Draw's

denials of assertions in Garcia's Local Rule 56.1(b)(3)(C) statement merely establish genuine

factual disputes, Doc. 50 at ¶¶ 10, 14-16, 27-28, 33-35, those disputes are resolved in favor of

Garcia, the non-movant. *See Johnson*, 892 F.3d at 893. Second, contrary to Draw's suggestion, Doc. 50 at ¶¶ 33-35, "a declaration under [28 U.S.C.] § 1746 is equivalent to an affidavit for purposes of summary judgment." *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011)).

Third, Draw's objection to Garcia's use of Tina Lopez's declaration, Doc. 50 at ¶ 21; *see* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."), is overruled. Lopez's declaration recounts statements that she heard George Ward ("George"), one of Draw's principals, make about Garcia's overtime pay requests, and further recounts that Lopez relayed to Garcia the substance of George's statements. Doc. 47-9 at ¶¶ 5-7, 9; Doc. 50 at ¶ 1. Draw asserts that Lopez's declaration is inadmissible because Garcia produced it after Lopez failed to appear for her deposition and because it includes inadmissible hearsay. Doc. 50 at ¶ 21.

As to the first objection, Draw cites no authority for the proposition that an affidavit or declaration provided by a declarant after she fails to appear for a deposition should be disregarded, thereby forfeiting the point. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (internal quotation marks omitted). As to the second objection, a statement by Draw's principal concerning Draw's business is, if introduced by Garcia, a party-opponent statement that falls outside the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(D) (providing that an out-of-court statement "offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay); *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011) (explaining that Rule 801(d)(2)(D) applies where statements made by a party's agent or employee "concerned a matter within the

2

scope of [the agent's] employment"). And Lopez's averment that she told Garcia about George's statements, Doc. 47-1 at 34; Doc. 47-9 at ¶ 9, is not hearsay insofar as it is evidence that Lopez made Garcia aware of the statements. *See Anderson v. United States*, 417 U.S. 211, 220 & n.8 (1974) ("[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement.").

### A.    Garcia's Overtime Work

Garcia was Draw's payroll administrator until her termination on April 25, 2017. Doc. 47 at pp. 1, 6, ¶¶ 1, 36. As payroll administrator, Garcia ensured that Draw employees logged their hours in ADP, Draw's payroll system. *Id*. at pp. 1-2, ¶¶ 2-3, 5; Doc. 50 at ¶¶ 2-3. Garcia was responsible for entering her own time, including requests for overtime pay. Doc. 47 at p. 2, ¶¶ 4, 8; Doc. 50 at ¶ 4. Alexis Ward ("Alexis"), Draw's head of human resources, and Jeff Godfrey, Draw's controller and chief financial officer, reviewed Garcia's payroll entries and approved her overtime requests. Doc. 47 at p. 9, ¶ 50; Doc. 50 at ¶¶ 2, 4, 18.

Garcia's shift ended at 3:30 p.m., and 2.5 hours of overtime was built into her normal weekly schedule. Doc. 50 at ¶¶ 4-5. Garcia performed several kinds of overtime work outside of her shift: she responded to emails and work requests; finished tasks she could not complete during her shift; performed recruiting duties; and picked up water for the office. *Id*. at ¶¶ 5-10, 17, 19, 26; Doc. 47-1 at 40-41. Garcia indicated in her 2015 and 2016 self-appraisals that she would work and answer emails and phone calls outside of shift. Doc. 50 at ¶ 13. Garcia estimates that this overtime work averaged five hours per week beyond her built-in 2.5 hours of overtime; put another way, Garcia averaged 7.5 overtime hours per week, five hours more than the 2.5 built-in overtime hours for which she did not have to seek approval. Doc. 47 at pp. 3, 5, ¶¶ 15, 26; Doc. 50 at ¶¶ 4, 15.

Garcia did not report all her overtime for fear that she would get into trouble, although she conceded that she did not know anyone else who experienced trouble or was not paid after requesting overtime. Doc. 47 at pp. 3, 5, ¶¶ 13-15, 31; Doc. 50 at ¶ 24. Alexis and Godfrey approved every overtime request that Garcia submitted, but told Garcia that she should work less overtime. Doc. 47 at p. 2, ¶¶ 6, 8; Doc. 50 at ¶¶ 4, 16, 24. Tina Matt, who became Garcia's supervisor and Draw's human resources manager in January 2017, likewise advised Garcia to minimize her overtime and unsuccessfully attempted to remove her built-in overtime hours. Doc. 50 at ¶¶ 1, 27; Doc. 47-2 at 3. Despite discouraging her from working overtime, Godfrey expected Garcia to help him with payroll issues that arose outside her normal shift. Doc. 50 at ¶ 6. Garcia felt obligated to respond immediately when employees, including her supervisors, contacted her after her shift. *Id*. at ¶ 9. Those after-hours requests led Garcia to believe that her supervisors did not actually want her to work less overtime. *Id*. at ¶ 17.

In addition to her fear of getting into trouble, Garcia did not record smaller increments of overtime work—periods of fewer than thirty minutes—due to the effort involved in recording such time. Doc. 47 at p. 2, ¶ 10. (Contrary to Draw's assertion, Garcia's deposition testimony reflects that she did not record twenty- or thirty-minute periods of off-hours work *both* because "it was too much bother to log onto the ADP website" *and* because she did not "want to get in trouble for having overtime." Doc. 47-1 at 16.) Similarly, Garcia did not record time worked over lunch due to the effort of recording "No Lunch" in ADP and the fear of angering her supervisors. Doc. 50 at ¶ 11; Doc. 47-1 at 33, 40. But if Garcia was working a longer period of overtime, she would log that time on ADP. Doc. 47 at p. 3, ¶ 12.

In 2014, Garcia asked Godfrey for a bonus for working extra hours in lieu of reporting the additional overtime she had worked. Doc. 50 at ¶ 14. Although Godfrey initially indicated

4

that Garcia would receive such a bonus, she was later told that her bonus was the overtime she had already been paid. *Id*. at ¶¶ 14-15 (citing Doc. 47-1 at 25-26). Garcia understood from this exchange that she would not be compensated for her additional overtime. *Id*. at ¶ 15.

In late 2015, Tina Lopez told Garcia that she had overheard George say to Alexis and Godfrey: "If [Garcia] gets one more hour of overtime, I am going to walk over there, rip her check up and immediately fire her myself." *Id*. at ¶¶ 1, 21; Doc. 47-9 at ¶¶ 6-7. George's statement further discouraged Garcia from reporting overtime beyond her 2.5 hours of built-in overtime. Doc. 50 at ¶ 22.

### B. Garcia's Termination

Garcia first raised the issue of uncompensated overtime in a discussion with Alexis about six months after she started at Draw in 2014. Doc. 50 at ¶ 12; Doc. 47-1 at 4, 29. Some two years later, around late March 2017, Garcia complained to Matt that she was working after hours but not being paid overtime. Doc. 50 at ¶ 28a (there are two ¶¶ 28 in Draw's response to Garcia's Local Rule 56.1(b)(3)(C) statement, which will be referred to as ¶ 28a and ¶ 28b); Doc. 47 at pp. 5-6, ¶¶ 29-31; Doc. 47-1 at 40. (Draw contends that Garcia's testimony that the conversation took place around March 2017 conflicts with her earlier testimony. Doc. 50 at ¶ 28a (citing Doc. 47-1 at 21, 40). But Garcia's earlier testimony indicated that the conversation occurred in "early 2017," "a few months after [Matt's] employment started" in January 2017. Doc. 47-1 at 21; Doc. 50 at ¶ 1. There is no conflict.) During that late March 2017 conversation, Garcia told Matt that Draw's failure to pay her overtime was illegal. Doc. 50 at ¶ 28a (citing Doc. 47-1 at 24). Matt responded that Garcia should be compensated, but did not explain how. Doc. 47 at p. 6, ¶ 32; Doc. 50 at ¶ 28a.

Immediately after that conversation, Matt met with Frank Ward III ("Frank"), Draw's in-house counsel and human resources supervisor. Doc. 50 at ¶ 28b; Doc. 47 at p. 8 ¶ 43. Matt told Frank that Garcia claimed to have worked from home outside of her normal work schedule. Doc. 50 at ¶ 28b; Doc. 47-2 at 7. Frank responded that he was unaware of any occasions where Garcia was supposed to work from home but had not been paid. *Ibid*. About a month later, in late April 2017, Garcia was terminated. Doc. 47 at p. 6, ¶ 36.

Frank, Matt, and Godfrey collectively made the decision to terminate Garcia after having discussed the matter with George. Doc. 50 at ¶ 38. During the decisionmaking process, Matt described Garcia to Frank as a "complainer"—although Matt did not specifically mention Garcia's complaints about unpaid overtime, *id*. at ¶ 29, the only complaints that Garcia had made to Matt were that she was not being paid for all her hours, *id*. at ¶ 34; Doc. 47-13 at ¶ 6.

Upon being terminated, Garcia was told only that she was being laid off and that her services were no longer needed. Doc. 50 at ¶ 36. Draw's end-of-employment checklist for Garcia indicates that she was "laid off." *Ibid*. (quoting Doc. 47-14 at 1). In the spaces on Draw's termination form indicating the possible grounds (*e.g.*, statement of the problem, prior discussions or warnings about the problem, dates and times of each relevant event) for Garcia's termination, Matt wrote "not applicable." *Ibid*. (quoting Doc. 47-14 at 2).

Draw asserted in an interrogatory answer that it terminated Garcia because she was not sufficiently willing to work with Matt. Doc. 50 at ¶ 39; Doc. 47-12 at 3. When meeting with Garcia in February 2017 for her last annual review, Frank told Garcia to show more willingness to train Matt. Doc. 47 at p. 8, ¶ 47; Doc. 47-7 at 2, 4. Garcia also was told during that annual review to improve her interpersonal relationships and communication. Doc. 47 at p. 9, ¶¶ 48-49; Doc. 47-7 at 1-2. After that review, Garcia provided Matt the training in question; by the time

Garcia was terminated, Matt no longer required training from Garcia.  Doc. 50 at ¶ 35.  Garcia never refused or expressed unwillingness to train Matt, despite her supervisors' contrary impression.  *Ibid.*; Doc. 47-13 at ¶¶ 4-5; Doc. 47 at pp. 7-9, ¶¶ 39, 44-45, 52.

Although they did not testify in their depositions that Garcia's communication issues led to her termination, Frank and Matt testified that they received complaints that Garcia was difficult to reach.  Doc. 47 at pp. 7-9, ¶¶ 38, 40-41, 44-45.  After raising that issue with Garcia in her last annual review, Frank expressed his understanding that her many responsibilities kept her away from her desk, and added that he needed to bring up something because no review could be perfect.  Doc. 50 at ¶ 32.  Moreover, Frank never raised concerns about Garcia's lack of communication either before or after her last annual review.  *Ibid*.  Although Matt instructed Garcia to return phone calls, Matt never relayed to Garcia any complaints from other employees.  *Id*. at ¶ 33; Doc. 47-13 at ¶ 2.

### Discussion

Garcia alleges that: (1) she worked overtime for which she was not paid, in violation of the FLSA, IWPCA, and IMWL; and (2) she was fired for complaining about Draw's failure to pay overtime, in violation of the FLSA and IWPCA.  Doc. 1 at ¶¶ 14-40.  Draw moves for summary judgment on both sets of claims, arguing as to the first that Garcia cannot prove Draw's knowledge of or damages from unpaid overtime, and as to the second that she cannot establish a causal link between her protected activity and her termination.

### I.    Overtime Pay Claims

As noted, Garcia's unpaid overtime claims arise under the FLSA, IWPCA, and IMWL.  Doc. 1 at ¶¶ 14-33.  The parties' briefs discuss only the FLSA and fail to identify, let alone differentiate, the IWPCA's and IMWL's elements and standards.  Doc. 40 at 2-3; Doc. 48 at 5-7.

The court at summary judgment thus will use the FLSA standard to analyze Garcia's overtime claims. *See Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010) ("The overtime provision of the [IMWL], 820 ILCS 105/4a(1), is parallel to that of the FLSA, and Illinois courts apply the same principles … to the state provision."); *Singer v. Reg'l Transp. Auth.*, ___ F. Supp. 3d ___, 2018 WL 3957163, at *3-4 (N.D. Ill. Aug. 17, 2018) (same as to the IMWL, and noting that the IWPCA requires a plaintiff to show breach of an "employment agreement") (quoting *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016)).

"The FLSA requires employers to pay overtime to certain employees who work more than 40 hours in a work week." *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) (construing 29 U.S.C. § 207(a)). Under the FLSA, the employee bears the burden of showing that she performed unpaid overtime work, while the employer must prove an exemption from liability. *Ibid*. An employer may not avoid paying overtime by "deliberately clos[ing its] eyes to overtime work [its] employees are doing" after hours. *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017); *see also Kellar*, 664 F.3d at 177 (noting that, because 29 U.S.C. § 203(g) defines "[e]mploy" as "'to suffer or permit to work," the employer must know or have reason to know of overtime work to be liable under the FLSA).

Accordingly, "to prevail on a claim for unpaid overtime … , a plaintiff must clear two hurdles: first, the plaintiff must show that she worked overtime without compensation, and second, [the plaintiff must show that] the employer had actual or constructive knowledge about her overtime work." *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1220 (N.D. Ill. 2017) (citing *Kellar*, 664 F.3d at 176-77); *see also Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) ("An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work.");

*Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (same).  Draw concedes that Garcia has adduced evidence that she worked five hours of unpaid overtime per week, but contends that it did not have actual or constructive knowledge of that overtime.  Doc. 40 at 1, 3.

An employer has actual knowledge of an employee's unpaid work when it "observe[s] her working beyond her scheduled hours," *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1319 (11th Cir. 2007), and it has constructive knowledge "if it should have acquired knowledge of that work through reasonable diligence," *Allen*, 865 F.3d at 938.  An employer that exercises reasonable diligence "by establishing a reasonable process for an employee to report uncompensated work time" can avoid FLSA liability when the employee's "misuse" of the process, rather than the employer's conduct, causes unpaid overtime.  *Id.* at 938-39; *see also Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 271 (7th Cir. 2014) (holding that an employee's notations outside the payroll form's space for recording "hours worked" failed to "raise a reasonable inference that [the employer] knew that [the plaintiff] was working unauthorized overtime").  In other words, an employer will not be charged with constructive knowledge of unpaid work if the employee fails to comply with established reporting procedures and the employer has no other reason to know about the work.  *See Kellar*, 664 F.3d at 177 ("[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about."); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) ("When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA.").

All that said, an employee's failure to comply with an employer's "formal policy or process for reporting overtime" does not foreclose FLSA liability "if the employer prevents or

discourages accurate reporting in practice." *Allen*, 865 F.3d at 939; *see also* 29 C.F.R. § 785.13 ("The mere promulgation of a rule against [unauthorized overtime] work is not enough. Management has the power to enforce the rule and must make every effort to do so."). An employer might prevent an employee from reporting overtime by, for example, telling employees that overtime would not be paid or destroying accurate time sheets, and it might more subtly discourage reporting by, for example, demanding "long and irregular hours" while insisting "that all work be completed within certain defined time limits." *Allen*, 865 F.3d at 939 (quoting *Brennan v. GMAC*, 482 F.2d 825, 828 (5th Cir. 1973)); *see also Bailey*, 776 F.3d at 801 ("Knowledge [of unpaid overtime] may be imputed to the employer when its supervisors or management encourage artificially low reporting.") (alteration and internal quotation marks omitted). Whether an employer has exercised "reasonable diligence" sufficient to avoid knowledge of unpaid overtime "depend[s] on the facts of each case." *Allen*, 865 F.3d at 943.

Construed reasonably in the light most favorable to Garcia, the record shows that Draw had actual and constructive knowledge of her overtime work but discouraged her from accurately reporting her overtime hours. Godfrey, one of Garcia's supervisors, expected her to be available to assist with payroll issues that arose after her shift ended at 3:30 p.m. and, along with Alexis, Matt, Frank, and others, sent her after-hours work requests and received same-day responses. Doc. 50 at ¶¶ 6-9, 25. Because an employer's duty to pay for overtime work arises "even where [it] has not requested the overtime be performed or does not desire the employee to work," Draw's repeated after-hours requests for Garcia's work more than suffice to give it constructive, if not actual, knowledge of that work. *Kellar*, 664 F.3d at 177 ("The employer 'cannot sit back and accept the benefits [of overtime work] without compensating for them.'") (quoting 29 C.F.R. § 785.13); *see also Meadows v. NCR Corp.*, 2017 WL 5192009, at *9 (N.D. Ill. Nov. 9, 2017)

("Direction or pressure from a supervisor is sufficient here to raise an issue of material fact about [the employer's] constructive knowledge of [the plaintiff's] off-the-clock work.").

If Garcia's supervisors had any doubts about whether she was working overtime, they needed only check their email inboxes. Doc. 50 at ¶ 26 (describing after-hours email exchanges); Doc. 47-10 (collecting emails that Garcia sent after 3:30 p.m. between May 16 and May 20, 2016). By observing her after-hours email responses to their requests, Garcia's supervisors—and thus Draw—surely knew or should have known that she was performing substantial work after her shift ended. *See Allen*, 865 F.3d at 943 (imputing to the employer knowledge of overtime work where the employer was "notified of the employees' unreported work") (internal quotation marks omitted); *Bailey*, 776 F.3d at 802 ("[K]nowledge on the part of supervisors could be imputed to the employers."); *Allen*, 495 F.3d at 1319 ("[The employee's] testimony creates a genuine issue of material fact as to the [employer's] actual knowledge, because [the employee's] supervisor told her that she could not be paid overtime, but observed her working beyond her scheduled hours."). Draw's effort to liken this case to *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972), where the employee worked from home without the employer's encouragement or observation, therefore falls flat. Doc. 49 at 2-3.

Further support for this conclusion comes from evidence that some of Garcia's supervisors (Alexis and Godfrey) reviewed and approved weekly timesheets from her that did not report overtime hours. Doc. 50 at ¶¶ 4, 18. An employer may be charged with knowledge that an employee's time records do not align with actual work performed unless such a crosscheck would be "burdensome" or an "impossible task." *Allen*, 865 F.3d at 945; *see also Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 392 (6th Cir. 2016) (noting that "a jury *could* find that an employer exercising reasonable diligence should know what is on its own time

sheets and payroll records"). Draw has made no such showing here, especially not as a matter of law; after all, Godfrey approved Garcia's timesheets despite having personally observed her working after hours. Doc. 50 at ¶¶ 4, 6-7, 9, 18. If Draw did not want to pay Garcia overtime, it should have told her to disregard after-hours requests from her supervisors and colleagues rather than allowing and even encouraging her after-hours work to continue. *See Allen*, 865 F.3d at 938 ("If the employer does not want to pay overtime, its management must 'exercise its control and see that the work is not performed.'") (quoting 29 C.F.R. § 785.13); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008) ("An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance.") (collecting cases).

As Draw observes, Matt at one point suggested that Garcia should be paid for her overtime work. Doc. 49 at 6-7 (citing Doc. 47 at p. 6, ¶ 32). That one instance does not relieve Draw from liability, however, given the mixed signals (at best) that Draw sent regarding overtime, including George threatening to fire Garcia if she reported more overtime and Godfrey indicating that she should consider overtime already paid as a bonus covering her additional overtime work. Doc. 50 at ¶¶ 15-17, 19, 21, 24, 27; *see Allen*, 865 F.3d at 939 (explaining that the employer "effectively 'squelched truthful responses' in overtime reports" by demanding "long and irregular hours" while insisting "that all work be completed within certain defined time limits") (quoting *Brennan*, 482 F.2d at 827-28); *Bailey*, 776 F.3d at 802 (noting that "nominally" requiring accurate reporting is insufficient to avoid FLSA liability where "supervisors encouraged employees to underreport"). That Draw never altered Garcia's time records or rejected an overtime request does not eliminate the effect of its discouragement against claiming overtime or its awareness that she was working overtime. *See Allen*, 865 F.3d

at 939 (noting that the FLSA imposes liability whether the employer's discouragement of reporting overtime is "overt" or "subtle"); *White*, 699 F.3d at 877 (explaining that an employer may be liable where it "discourage[s] employees from reporting time worked" or is "otherwise notified that [its] employees [are] failing to report time worked"). At summary judgment, the court cannot weigh conflicting facts to determine the cumulative impact of those mixed signals, but instead must leave such determinations for the jury. *See Allen*, 865 F.3d at 945-46 (expressing skepticism that a FLSA overtime claim could be resolved at summary judgment where the employees testified that they did not claim overtime due to workplace culture, "concern for their positions," and fear of disapprobation).

Contrary to Draw's submission, Doc. 40 at 3; Doc. 49 at 1-2, 6, Garcia's failure to accurately record her time does not doom her ability to prove damages. As the Seventh Circuit held in *Brown v. Family Dollar Stores of Indiana, LP*, 534 F.3d 593 (7th Cir. 2008), "where the employer's own actions in keeping inadequate or inaccurate records made the best evidence of such damages unavailable," the employee can prove damages by "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id*. at 595 (internal quotation marks omitted). If the employee produces such evidence, the burden shifts "to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee's evidence." *Ibid*.; *see also Skelton v. Am. Intercont'l Univ. Online*, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005) ("Thus, if plaintiffs have evidence sufficient to support a finding that they were told not to record all their overtime, [the employer] cannot hide behind a policy of having employees keep their own time to avoid compensating the employees for all overtime hours

worked, including unrecorded hours.") (citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314-15 (7th Cir. 1986)).

Garcia has satisfied her evidentiary burden. A reasonable jury could conclude that, despite her position as payroll administrator, Garcia was susceptible to pressure not to report overtime because her timesheets required the review and approval of the same supervisors (Alexis and Godfrey) who encouraged her to work after hours but to minimize, if not eliminate, her additional overtime. Doc. 50 at ¶¶ 16-18. Moreover, Garcia did not report small segments of overtime or time spent in lunch meetings due to *both* the effort required to record such time *and* her fear of reprisal, Doc. 47 at p. 2, ¶ 10; Doc. 47-1 at 16, 33, 40; Doc. 50 at ¶ 11, and determining what weight to afford these competing explanations is a matter for the jury. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643 (7th Cir. 2002) (explaining that uncertainty about the "true cause" among multiple reasons "creates an issue of fact"). It follows that a reasonable jury could find that Draw, not Garcia, was responsible for her inaccurate time entries, and therefore that she has met her evidentiary burden to prove damages through her own testimony and Draw's email records. *See Brown*, 534 F.3d at 597 (noting that records of when the business was open, along with the employee's testimony about her typical after-hours duties, formed a satisfactory "basis for arriving at a just and reasonable inference as to the uncompensated hours"); *Kuebel*, 643 F.3d at 364 (holding that an employee's declaration estimating that he performed an average of "one to five hours of uncompensated overtime each week," even if not "precise," provided sufficient proof of damages); *Allen*, 495 F.3d at 1316-17 (holding that employees' "statements regarding the amount and extent of … uncompensated work in declarations and deposition testimony" were sufficient to prove damages); *Brown*, 246

F. Supp. 3d at 1221 (noting that an employee may "rel[y] on her memory" in order "[t]o show the amount and extent that she worked overtime without compensation").

Finally, Draw contends that even if Garcia performed uncompensated overtime work responding to emails, such work was *de minimis* and therefore not covered under the FLSA. Doc. 49 at 3-6. True enough, "[t]he *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute." *Kellar*, 664 F.3d at 176. But by failing to raise this argument until its reply brief, Draw forfeited the point for purposes of summary judgment. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

Accordingly, there is a sufficient basis on the summary judgment record for a reasonable jury to decide that Draw failed to pay Garcia overtime in violation of the FLSA, IMWL, and IWPCA, and to determine her damages.

## II. Retaliation Claims

As noted, Garcia's retaliatory discharge claims are brought under the FLSA and IWPCA. Doc. 1 at ¶¶ 34-40. As with Garcia's overtime claims, the parties' discussion of the retaliation claims addresses only the FLSA and fails to identify, let alone differentiate, the IWPCA's elements and standards. Doc. 40 at 7; Doc. 48 at 8. Accordingly, the court at summary judgment will likewise analyze Garcia's retaliation claims under the FLSA standard. *See Simpson v. Saggezza, Inc.*, 2018 WL 3753431, at *4 (N.D. Ill. Aug. 8, 2018) ("The [IWPCA] permits employees to recover if an employer discharges the employee because [s]he 'has made a

15

complaint to [her] employer … that … she has not been paid in accordance with the provisions of [the IWPCA].'") (quoting 820 ILCS 115/14(c)).

The FLSA "makes it unlawful for an employer 'to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA].'" *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (quoting 29 U.S.C. § 215(a)(3)) (alteration in original). "To establish a prima facie case of retaliation … , [a plaintiff] must show: (1) that [s]he engaged in protected expression; (2) that [s]he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Precedents concerning retaliation under anti-discrimination statutes may be used to analyze FLSA retaliation claims. *See id*. at 973-76 (relying interchangeably on FLSA and anti-discrimination cases when addressing a FLSA retaliatory discharge claim); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 884 (7th Cir. 1996) (noting that the FLSA's retaliation provision is "parallel" to those of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Age Discrimination in Employment Act, 29 U.S.C. § 623(d)). Draw does not dispute that Garcia suffered an adverse employment action, Doc. 49 at 7, so to survive summary judgment she must show that she engaged in protected expression and that there is a causal link between her expression and her termination. *See Kasten*, 703 F.3d at 972.

To constitute protected expression under the FLSA, an employee's statement or complaint "must 'be sufficiently clear for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Sloan*, 901 F.3d at 894 (quoting *Kasten v. Saint-Gobain Performance Plastics*

16

Case: 1:17-cv-04477 Document #: 57 Filed: 11/19/18 Page 17 of 23 PageID #:443

*Corp.*, 563 U.S. 1, 14 (2011)); *see also Kasten*, 703 F.3d at 976 (describing the inquiry as "objective") (quoting *Kasten*, 563 U.S. at 14). The number and nature of prior discussions between the employer and employee, the employee's assertion that the employer was breaking the law, and the employer's reaction to the complaint are relevant in determining whether the complaint is protected. *See Kasten*, 703 F.3d at 976.

Here, Garcia complained to Matt in late March 2017 that Draw was violating the law by not paying her for her additional overtime work. Doc. 50 at ¶ 28a. That complaint qualifies as protected expression under the FLSA. *See Kasten*, 703 F.3d at 976 (noting that a complaint is more likely protected "where an employee alleged that [the] employer was 'breaking some sort of law'") (quoting *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992)); *Starnes v. Wallace*, 849 F.3d 627, 632-33 (5th Cir. 2017) (holding that an employee's complaint that the employer "was violating the law by not paying [another employee] for travel time or overtime" could be considered protected expression under the FLSA) (internal quotation marks omitted). Although Garcia made her complaint during an informal, wide-ranging conversation with Matt, Matt immediately brought the complaint to Frank. Doc. 50 at ¶¶ 1, 28b; Doc. 47 at p. 5, ¶ 29. Matt's immediate follow-up with Frank indicates that she understood Garcia's comments as an actual complaint, not an offhand remark. *See Kasten*, 563 U.S. at 14 (holding that a complaint is protected when the employer "does, or should, reasonably understand the matter as part of its business concerns"); *Sloan*, 901 F.3d at 895 (noting that FLSA protection usually applies where "the employee's complaint, though general, was readily recognizable as an objection that a particular employment practice regarding wages or hours was illegal"); *Kasten*, 703 F.3d at 976 (explaining that management's ongoing discussion of an issue raised in an employee's complaint weighed in favor of finding the complaint protected expression under the FLSA). That Garcia

17

had previously raised the issue of unpaid overtime, including in a conversation with Godfrey and on her 2015 and 2016 self-appraisals, Doc. 50 at ¶¶ 13-14, further supports the conclusion that Garcia's March 2017 complaint was protected expression under the FLSA. *See Kasten*, 703 F.3d at 976 (noting that prior complaints about unpaid work support the conclusion that a later complaint is protected expression); *see also Starnes*, 849 F.3d at 632 (highlighting that the employee had raised the same issue on multiple occasions in finding that the assertion was protected under the FLSA).

A "causal link" between a protected complaint and an adverse action may be inferred from: "(1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Kasten*, 703 F.3d at 973; *see also Baines v. Walgreen Co.*, 863 F.3d 656, 661-62 (7th Cir. 2017) ("If [a] plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment is not appropriate.") (internal quotation marks omitted) (alteration in original). Garcia argues that a causal link exists between her March 2017 complaint to Matt and her April 2017 termination based on the suspicious timing, ambiguous statements, and pretextual reasons surrounding the termination. Doc. 48 at 8.

Although there is no "bright-line rule" about what constitutes "suspicious timing," "where there is corroborating evidence of retaliatory motive, an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) (internal quotation marks omitted); *see also Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (noting that whether timing is suspicious "depends on context"). Here, Garcia's termination occurred about one month after

she complained to Matt and Matt relayed the complaint to Frank. Doc. 50 at ¶¶ 28a-28b (indicating that the complaint to Matt occurred in late March 2017 and that Matt's conversation with Frank occurred immediately thereafter); Doc. 47 at p. 6, ¶ 36 (establishing April 25, 2017 as Garcia's termination date). A one-month interval between protected expression and adverse action qualifies as "suspicious timing." *Magyar v. Saint Joseph Regional Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) ("This court has found a month short enough to reinforce an inference of retaliation."); *Frey v. Hotel Coleman*, 141 F. Supp. 3d 873, 884 (N.D. Ill. 2015) (finding an interval of slightly more than one month sufficient to constitute suspicious timing); *Haskell v. Cook Cnty. Hous. Auth.*, 2013 WL 1943275, at *8 (N.D. Ill. May 9, 2013) (holding that "a reasonable jury" could find a five-month gap "suspicious").

True enough, "suspicious timing alone is rarely enough to survive summary judgment." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (internal quotation marks omitted). But the context of Garcia's termination, particularly the record evidence suggesting that Draw's expressed reasons for terminating her are pretextual, provides "corroborating evidence of retaliatory motive" sufficient to foreclose summary judgment. *Gracia*, 842 F.3d at 1021; *see also Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (holding that "evidence of suspicious timing and pretext" together "are sufficient to withstand summary judgment").

"Pretext can be shown by identifying weaknesses, implausibilities, inconsistencies, or contradictions in an employer's asserted reason for taking an adverse employment action such that a reasonable person could find it unworthy of credence." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (internal quotation marks and alterations omitted). The presence of "shifting explanations" that are "sufficiently inconsistent or otherwise suspect" suggest pretext. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013); *see also*

*Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 726 (7th Cir. 2005) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."). "Ordinarily, the persuasiveness of an employer's non-retaliatory explanation" is a factual question, with summary judgment proper only when "the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 431 (7th Cir. 2018) (internal quotation marks omitted).

Draw has offered three explanations for Garcia's discharge. First, when she was "laid off," Garcia was simply told that "her services were no longer needed." Doc. 50 at ¶ 36. Second, after Garcia filed suit, Draw asserted in an interrogatory response that she was terminated because "she was unwilling to provide proper training to and work cooperatively with" Matt. Doc. 47-12 at 3. Third, in its summary judgment motion, Draw suggests that Garcia's failure to respond to messages was a ground for her termination. Doc. 40 at 7.

The record would allow a reasonable jury to find that these evolving explanations are pretextual. As an initial matter, Draw failed to list any of these explanations in the section of Garcia's termination form titled "Explanation for Termination." Doc. 47-14 at 2. This failure casts doubt on the validity of Draw's later explanations. *See Hitchcock*, 718 F.3d at 739 (noting that an employer's "piling on additional ever-evolving justifications … may cause a reasonable juror to wonder whether [the employer] can ever get its story straight"); *Culver v. Gorman & Co.*, 416 F.3d 540, 549 (7th Cir. 2006) (suggesting that while "employers may elaborate on the reasons for an adverse employment action once litigation has commenced," extensive elaboration of an originally "vague" explanation may support a finding of pretext).

Moreover, a reasonable factfinder could find that Draw's justifications for the termination—Garcia's communication and interpersonal issues—are contradicted by the record. As to the communication issues, which Draw first identified as a basis for termination at summary judgment, no supervisor involved in the termination decision testified that he or she actually relied on that justification. Doc. 50 at ¶ 38 (Frank, Godfrey, and Matt made the decision to terminate Garcia); Doc. 47 at p. 8, ¶ 45 (Frank stating that he decided to terminate Garcia based on her unwillingness to work with Matt); *id*. at p. 9, ¶ 52 (Godfrey stating that Garcia was terminated because she would not work well with Matt); *id*. at p. 7, ¶ 38 (Matt stating that Garcia was discharged because she would not help Matt succeed). Accordingly, a reasonable jury could find that this basis for the termination is unworthy of belief. *See Greengrass*, 776 F.3d at 487 ("Where, as here, there is a question of fact as to the believability of an employer's purported reasons for an employment decision … , at a bare minimum it suffices to defeat [the employer's] summary judgment motion.") (internal quotation marks omitted) (second alteration in original); *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 677 (7th Cir. 2003) ("[T]he consistency of the explanation provided by an employer at the time of an employment decision and [in subsequent proceedings] is evidence of the veracity of the employer's explanation at summary judgment."); *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 634 (7th Cir. 1996) (considering the employer's "failure to express this explanation earlier despite several opportunities to do so" indicative of pretext).

A reasonable jury could similarly find pretext in Draw's submission that Garcia was terminated because she did not work well with Matt. Doc. 47 at p. 8, ¶ 47; Doc. 47-7 at 2, 4. In explaining that she was unable to work with Garcia, Matt described her as a "complainer." Doc. 50 at ¶ 29. This ambiguous description, raised during the group decision to terminate Garcia,

could have referred to her overtime complaint, the only complaint that Garcia had raised to Matt, which Matt had recently discussed with Frank.  Doc. 50 at ¶¶ 28a-28b, 34, 38; *see Kasten*, 703 F.3d at 974 (holding that "ambiguous statements" about an employer's motive that are susceptible of more than one interpretation pose "an appropriate question for the jury").  Thus, a reasonable jury could find that this ostensibly non-retaliatory basis for Garcia's discharge (her poor attitude about working with Matt) is intertwined with her protected activity (complaints about unpaid work) and therefore is, in fact, retaliatory.  *See Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 920 (7th Cir. 1996) (noting that "the plaintiff could withstand summary judgment" if the employer's proffered justification "for the adverse action of which the plaintiff complains [is] so intertwined" with a "fishy" reason as to cast doubt on the proffered justification).  Moreover, by the time Garcia was terminated in late April 2017, two things had changed from February 2017, when she was told to show more willingness to train Matt: Matt no longer needed her training, and Garcia had complained about unpaid overtime.  Doc. 50 at ¶¶ 28a-28b, 35; *see Donley*, 906 F.3d at 639 ("[A] reasonable jury could interpret the suspicious timing as evidence (a) that one or both decision-makers initially found [the employee's] actions … to be tolerable, and (b) that they decided only later, after she had filed her internal complaint, to use that incident as a pretext to fire her for retaliatory reasons.").  Together, these developments undermine Draw's attempt to rely on this ground for termination and further support a finding that Draw's post hoc justification is pretextual.  *See Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied.").

Given the array of evidence in the summary judgment record, a reasonable jury could find that Garcia's complaint about overtime caused her discharge and therefore that Draw retaliated against her in violation of the FLSA and IWPCA.

## Conclusion

For the foregoing reasons, Draw's summary judgment motion is denied. Garcia's overtime and retaliation claims will proceed to trial.

November 19, 2018

_____
United States District Judge